[No. A046801. First Dist., Div. Four. May 22, 1990.]

In re the Marriage of JUDITH ANN and JOEL DON EVERETT.
JOEL DON EVERETT, Respondent, v.
JUDITH ANN EVERETT, Appellant.

COUNSEL

Mike Nail, District Attorney, Christopher M. Jackson and Alberta Chew, Deputy District Attorneys, for Appellant.

David Karabinus for Respondent.

OPINION

**ANDERSON, P. J.**—Judith Everett Shatto (Shatto) appeals from an order modifying child support and determining child support arrearages. She

alleges five points of error, several of which respondent Joel Don Everett (Everett) concedes. We partially reverse and remand with directions.

## I. BACKGROUND

At separation in February 1983, the Everetts had seven children ranging in age from less than one year to fourteen. In October and November of that year, the court issued temporary restraining orders commanding that Everett refrain from drinking any alcoholic beverage when having custody of his children. By interlocutory judgment of dissolution filed March 22, 1984, the court awarded physical custody of the children to Shatto and ordered Everett to pay child support in the amount of $85.71 per month per child ($599.97 total).

Since separation and almost continually thereafter, Shatto has received aid to families with dependent children (AFDC). Everett had worked for a number of years at Safeway as bakery manager, then salesperson, but lost his job shortly before separation due in part to drinking problems. He then began working at Little Darlings Fine Pastry (Little Darlings) and married the proprietor, Joyce Everett, in 1984. Joyce had purchased the bakery in 1983 with funds from her own divorce settlement; she testified she ran the bakery alone for about a month.

Then in August 1988, Everett moved to modify visitation. The following January Shatto moved for wage assignment, security for future child support payments, determination of arrearages and modification of child support. Everett, in declaration, also asked the court to modify support. After a hearing the court (1) set Everett's child support obligation at $284 per month for six minors (i.e., excluding Joel, d.o.b. July 29, 1969) for the time frame between January 1, 1988, and February 28, 1989; (2) ordered Everett to pay $264 per month for five minors (i.e., excluding Joel and Joy, d.o.b. Feb. 5, 1971) effective March 1, 1989; (3) allotted Everett a credit of $1,153.82 for calendar year 1988; (4) ordered Everett to pay an additional sum of $35 per month on child support arrearages to the district attorney; and (5) denied Shatto's request for wage assignment and security without prejudice.

## II. DISCUSSION

On appeal Shatto argues the court erred in (1) terminating support for Joy, aged 18, while she was still attending high school full-time; (2) modify-

ing child support retroactively to January 1, 1988; (3) denying her request for wage assignment; (4) allowing Everett to pay arrears at the rate of $35 per month; and (5) neglecting to look to Everett's earning capacity in setting current child support.

### A. *Terminating Support for Joy*

■ Everett agrees that the court erred in terminating support for Joy after February 28, 1989. When an unmarried child reaches age 18, is a full-time high school student and resides with a parent, the parents' obligation to support that child continues until he or she finishes the 12th grade or turns 19, whichever occurs first. (Civ. Code,[1] § 4704.5.) Joy turned 18 on February 5, 1989, but continued to live with her mother and attend high school, graduating in June 1989. The court mistakenly terminated Everett's support duty before Joy had completed her senior year. (§§ 196, 4704.5.)

### B. *Retroactive Modification*

■ The court reduced Everett's support obligation from $599.97 per month for seven children to $284 per month for six children effective January 1, 1988. The law allows retroactive modification of any order modifying or revoking a support order, but only to the date of filing the notice of motion or order to show cause. (§ 4700, subd. (a)(1).) In this case Shatto moved to modify support on January 24, 1989, the outside date for retroactive modification.

Everett concedes the court erred in selecting January 1, 1988, as the modification date.[2] Further, this error encompasses the $1,153.82 credit for overpayment for calendar year 1988 which the court ordered on the assumption that Everett owed only $3,400 ($284 x 12) but had paid $4,451.82 through October 1988.

### C. *Mandatory Wage Assignment*

■ Shatto sought a "mandatory" wage assignment which the court denied without prejudice. She correctly contends the court had no discretion to deny this request.

---

[1] All statutory references are to the Civil Code unless otherwise indicated.

[2] Everett apparently signed a stipulation to correct error conceding that January 24, 1989, was the correct date. Shatto, wishing to argue other issues on appeal, did not sign the stipulation.

Because Shatto was and is receiving AFDC, her right to support from Everett on behalf of their children was assigned to the county by operation of law. (Welf. & Inst. Code, § 11477, subd. (a).) Pursuant to section 4702, whenever the court orders child support payable to a parent receiving welfare funds for maintenance of minor children, it must direct the payor to make payment to the appropriate court-designated county officer. (§ 4702, subd. (a).) In this case the interlocutory judgment specifically provided that as long as Shatto received AFDC, Everett must direct his support payments to the district attorney. Since Shatto is still an AFDC recipient, the district attorney is still the support payee.

Section 4701, subdivision (*l*), mandates that the court issue an order for wage assignment when it has directed support to be paid through the district attorney.[3] In a case such as this where the custodial parent is an AFDC recipient and the supporting parent pursuant to court order is making payments to the district attorney, the court cannot decline to issue a wage assignment order. (*County of San Diego* v. *Bouchard* (1987) 195 Cal.App.3d 34, 39 [240 Cal.Rptr. 391].)

■ Everett does not object to an order for wage assignment; instead, he comments that it was "apparent" to the trial court that he was not an employee but rather a co-owner and operator of Little Darlings.[4] The implication of his reasoning is that the court denied the request without prejudice because wage assignment would be a futile remedy.[5]

We note that on May 12, 1988, the Solano County District Attorney filed a notice of intent to seek ex parte wage assignment in the event of default in

---

[3] Subdivision (*l*) of section 4701 reads in part: "Notwithstanding subdivisions (a) and (b), in any case where support is ordered to be paid through the district attorney for those purposes, or upon the district attorney's or obligor's request, the court shall issue an order for a wage assignment pursuant to this section."

[4] Everett relies on his testimony that he and Joyce operate the bakery as a "mom and pop" business to support the claim that he is part owner rather than an employee of Little Darlings. This allegation of ownership flies in the face of his own direct testimony and declaration that Joyce has always owned the bakery, having purchased it with her money, and he has "no ownership at all" in the business. True, he explained, they ran the business as partners, and while he did not claim he was an employee, the fact remains they both agreed the business belonged to Joyce. Further, according to their tax returns, Little Darlings is an unincorporated business, the profit and loss statement and self-employment tax forms listing only Joyce as, respectively, the "proprietor" and "person with self-employment income."

[5] Indeed the statutory wage assignment provisions are meaningless and redundant when it comes to actually attempting to serve the order on the "employer" of an unincorporated, self-employed parent because (1) there would be no wages or salary subject to assignment and (2) the delinquent obligor, being also his or her own "boss," has already been directly ordered by the court to pay support to the custodial parent, district attorney, or other designated payee.

child support payments. Everett claims, without support in the record, that the district attorney attempted to levy on his wages but the assignment papers were returned stating that Everett was part owner and not an employee of Little Darlings.

Whether or not Everett is presently an employee of Little Darlings or any other establishment is beside the point when it comes to the court's general duty to issue a wage assignment order whenever support is being paid through the district attorney. The order for wage assignment required under section 4701 operates as an assignment of the designated portion of the obligor's wages to the assigned payee and is "binding upon *any existing or future employer* of the obligated parent upon whom a copy of the order is served." (§ 4701, subds. (a), (b), italics added.) The actual order, prescribed by the Judicial Council, is generic in form, directed simply "To THE EMPLOYER REGARDING YOUR EMPLOYEE (name)."[6] Thus, regardless of Everett's current employment status, the court is duty bound to issue a wage assignment order in this case.

### D. *Order Re: Arrearages*

■ The parties stipulated to arrearages in the amount of $15,676.08. Shatto next argues that the order allowing Everett to pay off the arrearages at the rate of $35 per month, spreading payment over 37 years, was an impermissible retroactive modification of a final order. We disagree.

The court has discretion to modify any child support order except as to amounts accrued prior to filing the notice of motion or order to show cause. (§ 4700, subd. (a).) Accrued arrearages are treated like a money judgment, each payment having become due under an extant judgment or order. (*Jackson* v. *Jackson* (1975) 51 Cal.App.3d 363, 366 [124 Cal.Rptr. 101].)

Shatto calls our attention to the case of *Fuentes* v. *Fuentes* (1961) 188 Cal.App.2d 715 [10 Cal.Rptr. 732] wherein the reviewing court reversed an order allowing installment payments of $15 per month on a $305 delinquency. The court considered such an order to be a retroactive modification as to the accrued delinquencies, citing as Supreme Court authority *Keck* v. *Keck* (1933) 219 Cal. 316 [26 P.2d 300]. (*Fuentes* v. *Fuentes, supra,* 188 Cal.App.2d at p. 718.) In *Keck* there was an issue of $2,587.50 in arrearages under an order for alimony pendente lite and a interlocutory divorce decree. The trial court ordered the husband to pay $1,000 in full settlement of all

---

[6] Section 4701, subdivision (c), directs: "The Judicial Council shall prescribe forms for the orders for wage assignment required or authorized by this section. . . ."

claims and demands decreed and ordered, offsetting an existing indebtedness of the wife against accrued alimony. The court held that such an order, which relieved the husband from paying accrued alimony in cash as ordered, and discharged the alimony by offsetting it against his wife's indebtedness, was a modification as to past due installments. (*Keck* v. *Keck*, *supra*, 219 Cal.App.3d at p. 321.) Clearly the order in *Keck* was an impermissible retroactive modification because it cut off the wife's ability to enforce arrears under the prior orders. The unique feature of the *Keck* order, curtailing the wife's rights and remedies, was not present in *Fuentes* and is not present here.

The more recent case of *Jackson* v. *Jackson, supra,* correctly distinguishes between an order which purports to retroactively modify past due installments, and a subsequent enforcement order which the court renders pursuant to its powers under section 4380.[7] In *Jackson* the husband moved to quash a writ of execution for unpaid support payments which had accrued during the time he had sole physical custody of his daughter and had provided her with a home and support. The court refused to quash the writ. Under these circumstances the reviewing court determined that the lower court had discretion to quash the writ or permit only partial enforcement. (*Jackson* v. *Jackson, supra,* 51 Cal.App.3d at p. 368; see also *In re Marriage of Okum* (1987) 195 Cal.App.3d 176, 182 [240 Cal.Rptr. 458].) The court in *Jackson* explained that while a court may not retroactively modify past installments, it can deny enforcement of a judgment on equitable grounds and, under this analysis, quashing the writ of execution is distinct from retroactively modifying the original order. (*Jackson* v. *Jackson, supra,* 51 Cal.App.3d at p. 367.) The court pointed out that under section 4380, the court has discretion to determine in each case whether execution is the appropriate remedy to enforce its order. (*Id.,* at p. 368.)

While the facts here are far afield from those in *Jackson,* the distinction it draws between modification and enforcement is on point. Section 4380 broadly vests the superior court with authority to enforce family law judgments and orders. The order requiring Everett to pay down arrearages at the rate of $35 per month is not a retroactive modification of the arrears but rather an exercise of the court's equitable discretion to enforce its orders. The order does not operate to forgive or compromise the outstanding debt nor does it preclude future modification or future enforcement efforts by way of execution, interception and the like. However, until the district

---

[7] Section 4380 reads: "Any judgment, order, or decree of the court made or entered pursuant to this part may be enforced by the court by execution, the appointment of a receiver, contempt, or by such other order or orders as the court in its discretion may from time to time deem necessary."

attorney prosecutes further enforcement proceedings, Everett would not be in contempt of court if he made the monthly arrearage payments pursuant to the order.

Without acknowledging that an order for installment payments on arrears is within the court's discretion, Shatto alternatively maintains that when an obligee for practical reasons agrees to accept installments, the court should consider what is a reasonable monthly payment, what the obligee will accept, and whether the proposed amount is realistic. At trial Shatto apparently sought a monthly payment of $100 on the delinquency.

■ We think the court's order reflects these concerns. It found that Everett had a net disposable monthly income of $600.[8] Out of this monthly income Everett must meet his current support obligation of $264 and pay $35 on arrears, leaving him with $301 to meet monthly expenses, including other debt service. According to Everett's income and expense statement, the couple's monthly expenses are $1,002; he explained that he and his wife have only been able to meet personal expenses by spending funds from Joyce's divorce settlement, now nearly depleted. Given these facts, we do not think the court abused its discretion in ordering payment of $35, instead of $100, on the arrears.

### E. Order Regarding Current Support

Appellant finally challenges the current level of support established by the court on two fronts: (1) there has been no change in circumstances and (2) the court erroneously failed to base the award on earning capacity, instead, relying solely on earned income.

The court set Everett's current support obligation by following the Agnos Act[9] standards for determining the minimum mandatory amount of child support. Under the act the court determines the mandatory minimum by first calculating each parent's monthly net disposable income, as defined in section 4721, subdivision (a), and then multiplying this amount by a percentage factor based on the number of minors needing support. (§ 4722,

---

[8] Specifically, the court found "that Petitioner's net disposable income is $600, with $200 allocated toward his present spouse's net disposable income." It is unclear what the court meant by the $200 allocation, but neither party argues that the finding on Everett's monthly income lacks substantial evidentiary support. We therefore proceed on the basis that Everett has a net disposable income of $600 per month.

[9] This reference is to the Agnos Child Support Standards Act of 1984. (§ 4720 et seq.)

subd. (b).) If the product is less than the AFDC standard for the number of children involved, the court must find that the parents are unable to pay at that level and must set a minimum award according to the actual combined net income multiplied by the appropriate percentage. (*Ibid.*)

In this case only Everett's income factored into the equation because Shatto had no income apart from AFDC. (See § 4721, subd. (b), providing that annual gross income [from which net disposable income is derived] does not include income derived from any public assistance program.) Applying a percentage factor of 44 for five children, the court arrived at $264, substantially less than the AFDC minimum care standard of $713 for five persons, as set forth in Welfare and Institutions Code section 11452. (§ 4722, subd. (b) [40 percent for four children and additional 4 percent for each child thereafter]; § 4722, subd. (c) [AFDC standard for number of children to be supported shall be the minimum basic standard of adequate care specified in Welf. & Inst. Code, § 11452, adjusted annually pursuant to Welf. & Inst. Code, § 11453, for that number].)

(1) *Changed Circumstances*

■ Appellant's first argument, that modification of support was inappropriate since circumstances had not changed since the original support order, is flawed. Everett's income and expense declaration filed in November 1983 showed gross monthly income of $600 and $390 in monthly expenses, with no expenditures for residence payments or food and household supplies. Apparently Joyce was taking care of certain living expenses at that time. The following March, by stipulated interlocutory judgment, he agreed to pay nearly $600 per month child support. His current income is still $600 per month.

The Agnos Act, operative July 1, 1985, permits automatic review of all child support awards prior to the act's effective date pursuant to section 4730.[10] (*In re Marriage of Norvall* (1987) 192 Cal.App.3d 1047, 1051-1052 [237 Cal.Rptr. 770].) The interlocutory judgment having been filed in March 1984, section 4730 thus supports a request for modification in this case and we need not determine whether there was an independent change in circumstance.

---

[10] Section 4730 reads: "This chapter constitutes a change in circumstances for the purpose of allowing the modification of child support orders entered prior to July 1, 1985."

## (2)  *Earning Capacity*

Shatto next insists the court abused its discretion in refusing to take into account Everett's earning capacity as a skilled baker. She asserts the evidence supports only one conclusion, namely, Everett was avoiding his family responsibilities by persisting in an underemployed capacity at Little Darlings instead of seeking outside employment as a professional baker.

### (a)  *Relevant Facts*

The evidence forthcoming at trial reveals the following concerning Everett's past and present employment as well as the prospects for Little Darlings. When Everett was a member of the bakers' union some 12 years ago, he netted approximately $1,600 per month as a union baker. He is no longer a union member and does not know if he could join again today. Everett then went into sales, lost his position as salesperson partly because of drinking problems, and thereafter began working at Little Darlings. Everett explained he is an alcoholic, although he has not had anything to drink in six years, and has "a hard time" under stress. He does not "have the pressures" in his present situation.

Everett has worked as baker and buyer for Little Darlings for five years, putting in eight-to-nine-hour days in a business that yielded $3,728 in profit for the first quarter of 1989. Both Everett and Joyce feel the business could not be operated without his efforts. Everett claims no ownership interest in the bakery and is unfamiliar with the financial affairs of the business, deferring to Joyce in these matters. Joyce brings 20 years' experience as a bakery merchandiser to the business.

In 1987 profits declined because the business lost a major account, and the couple has considered instituting bankruptcy proceedings from time to time. Since 1987 the business has generated more profits, sales have increased and Everett laid off his baker's assistant (who was earning $7 an hour) as an economy measure. Joyce has invested separate property funds in the business to keep it afloat. The couple expressed optimism about the bakery's prospects. Joyce testified that "If we can stay in business for five more years, we'll have more money [than] you can shake a stick at.... Because they're going to put in a housing unit for 5,000 and we are the only bakery around, but it's just keeping it together now."

The court found that Everett and Joyce "are in good faith pursuing a small business enterprise, a bakery, which is struggling." Further, it found

that Everett in good faith attempted to discharge his child support obligations, despite serious financial problems. Concerning the latter finding, we note that during the period 1984 through 1988, while working at Little Darlings, Everett paid a total of $23,337.82 in child support.

### (b) *Legal Background*

Historically, courts have focussed on earning capacity in fashioning child support awards in limited situations where the record demonstrated that the parent was shirking parental responsibilities by refusing to accept or seek gainful employment. (See *In re Marriage of Williams* (1984) 155 Cal.App.3d 57, 62 [202 Cal.Rptr. 10]; *Philbin* v. *Philbin* (1971) 19 Cal.App.3d 115, 121 [96 Cal.Rptr. 408].) ■ The Agnos Act now permits attribution of "earning capacity" to an unemployed or underemployed parent without specifically narrowing such consideration to deliberate attempts to foil support obligations. (See *In re Marriage of Nolte* (1987) 191 Cal.App.3d 966, 972-973 [236 Cal.Rptr. 706].) ■ ■ ■ ■ ■ In particular, section 4721, subdivision (a)(3) states in part: "To determine and apportion the mandatory minimum child support award at the AFDC level, the court shall also consider, to the extent consistent with the best interests of all of the children, the earning capacity of either or both parents." (See also subd. (a).)[11] ■ Thus, under the Agnos Act, the court must consider the earning capacity of a given parent where (1) there is some measurable capacity and (2) it would be in the children's best interests to do so.

In this case closing argument centered exclusively on whether the court should apply the ability to earn standard in setting the minimum award; counsel for Shatto argued that the county has been subsidizing the bakery venture for years, the situation was unfair, and Everett ought to go out and look for "a real life job." The district attorney in turn commented that since

---

[11] Shatto's separate argument concerning the court's duty to consider the needs of the children is superfluous, since the earning capacity consideration is directly linked to the best interests of the children. She says the court should have taken judicial notice of the fact that an award averaging $52.80 per child is insufficient to support a minor child for one month. The Agnos Act, which the court followed in determining the award, is premised on the intent that the system of standards and procedures for determining child support will assure "that, dependent upon the financial ability of each parent to do so, no child receives a support award less than would otherwise be established as the need for that child under the AFDC program." (§ 4720, subd. (d).) By definition, a court which follows section 4722 in determining the minimum mandatory award has considered the minimum amount necessary to support a child. However, where, as here, the net disposable income as multiplied by the appropriate factor for the number of children involved renders a product less than the AFDC standard, the court must set that lesser amount as the minimum award. Then we are back full circle to the question whether the net income should include an imputed "earning capacity" element based on the best interests of the child.

Joyce had also worked in the bakery field for 20 years, one of the Everetts could run the business while the other procured a "real job" to pay their debts.

Although earning capacity obviously was the principal controverted issue at trial, the parties did not request a statement of decision on this or any other matter. Absent evidence to the contrary, we presume the trial court adhered to the dictates of section 4721, subdivision (a)(3), and considered Everett's ability to earn as well as his current earnings, but in its discretion did not attribute additional earnings by virtue of his purported underemployment. (Evid. Code, § 664; *In re Marriage of Nolte, supra*, 191 Cal.App.3d at p. 973; see also *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 645 [183 Cal.Rptr. 508, 646 P.2d 179].) The record fails to support the conclusion that the trial court neglected to consider Everett's earning capacity. Indeed, the findings concerning his good faith in pursuing the bakery venture and discharging his support obligations imply the court's conscious rejection of this standard.

The question remains whether the court abused its discretion by not imputing income to Everett on an ability to earn standard. Thus far courts have wrestled with the Agnos Act "earning capacity" factor as it would apply to *unemployed* parents, whether custodial or supporting. In the custodial situations, an obvious concern is whether, assuming employability, the best interests of the children militate in favor of the parent remaining at home instead of seeking employment. (See *In re Marriage of Kepley* (1987) 193 Cal.App.3d 946, 953 [238 Cal.Rptr. 691]; *In re Marriage of Nolte, supra*, 191 Cal.App.3d at p. 973.) When it comes to the noncustodial supporting parent, deliberate avoidance of family responsibilities is still significant to the earning capacity consideration. As recently explained in *In re Marriage of Regnery* (1989) 214 Cal.App.3d 1367, 1372 [263 Cal.Rptr. 243], earning capacity has three components, namely, ability, opportunity and willingness to work. If ability or opportunity are lacking, application of the standard is inappropriate, but if those factors are present and the obligor is unwilling to secure employment, the court can apply the earning capacity standard to deter willful avoidance of parental obligations. (*Id.*, at p. 1373.)

This case puts a different twist on the earning capacity issue. Simply put, we must decide whether the trial court abuses its discretion when it declines to impute additional income to a parent operating a small business on a quasi-self-employed basis where there is evidence this parent made substantially more money years ago in the same profession. We think not in this case.

First, the concern here is not that of working versus staying at home, or refusal to work. There is no question that Everett has been working full time on a continuous basis since the marital dissolution. And while Shatto makes allegations of Everett gifting his services to his wife's business,[12] it is clear that to the extent the business generates income, the couple treats that income as shared.

Second, the court's combined findings that Everett was sincere in his endeavors to make a success of Little Darlings and to pay child support, amply supported by the record as summarized above, are the equivalent of a finding that he was not shirking his parental obligations. We are mindful that, in addition to reviewing all the documentary evidence, the trial judge had an opportunity to assess the veracity and sincerity of Everett and Joyce, and on appeal we must respect the judge's credibility calls.

Third, on this record the trial court could conclude that Everett had no significant earning capacity apart from his efforts at Little Darlings. Shatto's position that Everett can and should earn more goes to his willingness and opportunity to work *in a different setting.* She suggests we should be wary of entrepreneurial enterprises at the expense of reimbursing the public for AFDC subsidies, and alcohol abuse is no excuse for not imputing earning capacity in this case. Although there was evidence of Everett's salary 12 years ago as a union baker, and more recent evidence that he and Joyce paid an assistant baker $7 per hour, these facts and figures do not necessarily mean Everett today could secure a position earning union or assistant baker's wages for another company. There has been a 12-year lapse in union membership, subsequent alcoholism and Everett's own assessment that the present situation is less stressful to him. Further, his labor and talents are key to Little Darlings, and his absence would obviously affect the bakery's profits. The trial court, reviewing all these facts, could determine Everett would be no better off abandoning Little Darlings for outside employment.

Finally, even if there were some measurable ability to earn apart from Little Darlings, the court was within its discretion to conclude it would not be in the childrens' best interests to apply this standard. Shatto cautions that when welfare is involved and the support award reimburses the public treasury for AFDC allowances, the burden on public funds makes the earning potential factor even more significant than in private, nonwelfare cases. These cautionary words do not translate into easily defined decision

---

[12] See *In re Marriage of Leib* (1978) 80 Cal.App.3d 629 [145 Cal.Rptr. 763] and *In re Marriage of Kepley, supra,* 193 Cal.App.3d 946 for discussion of the earning capacity standard in situations where one spouse or parent gives away housekeeping services to a cohabitant.

making at the trial level. The trial court's task is more delicate than simply deciding that because a parent might be able to earn more money, additional income should be imputed to that parent, thereby increasing the support award for the benefit of the children and/or the public purse.

Where the custodial parent is receiving AFDC and the supporting parent, after struggling with problems of alcoholism, begins working full-time at a family business in which his present wife has made a substantial investment, the trial court is looking at the needs, financial affairs and career decisions of a number of people as well as the reality of public assistance. It cannot force the parent to abandon the business and get a "real" job, but a support award attributing additional income to that parent on the basis of some measurable earning capacity would be backed by a myriad of enforcement remedies, and could well force the parent to restructure his or her affairs. Maybe the restructuring would not work out and the parent's financial situation and mental well-being would deteriorate. All of these factors are interrelated; while ultimately the court must consider earning capacity to the extent consistent with the best interests of the children, their best interest of course is affected by the economic as well as emotional strength of the supporting parent. Everett, although not the custodial parent, was seeking more involvement with his children by asking for increased visitation, including lengthy summer stays and alternative weekend visits. On the record before it the court could have reasoned that Everett was doing the best he could at this point in his life, and to "rock the boat" might in fact be detrimental to him and the children. And if the business succeeded, the children in all likelihood would share in its prosperity.

On the record before us we hold the court did not abuse its discretion in failing to attribute additional income to Everett under an earning capacity standard.

### III. DISPOSITION

The order is partially reversed, and the case remanded with directions to enter a revised order:

(1) Terminating support for Joy as of the month following her completion of high school;

(2) Modifying Everett's support obligation effective January 24, 1989, rather than January 1, 1988;

(3) Eliminating the $1,153.82 credit of "overpayment" in calendar year 1988; and

(4) Issuing a wage assignment order pursuant to section 4701.

In all other respects the order is affirmed; the parties will bear their own costs on appeal.

Poché, J., and Channell, J., concurred.